STATE of Alaska, Appellant,

v.

Lori L. OSTROSKY, Julianne Ostrosky
and Harold C. Ostrosky, Appellees.

Lori OSTROSKY and Julianne Ostrosky,
Cross-Appellants,

v.

STATE of Alaska, Cross-Appellee.

Nos. 6336, 6373.

Supreme Court of Alaska.

July 19, 1983.

John B. Gaguine, Asst. Atty. Gen., Jonathan K. Tillinghast, Asst. Atty. Gen., Wilson L. Condon, Atty. Gen., Juneau, for appellant/cross-appellee.

Frederick Paul, Paul, Johnson, Paul & Riley, Seattle, Wash., for Harold C. Ostrosky.

Robert H. Wagstaff, Wagstaff, Middleton & Pope, Anchorage, for Lori and Julianne Ostrosky.

Before BURKE, C.J., and RABINOWITZ, MATTHEWS and COMPTON, JJ.

## OPINION

MATTHEWS, Justice.

The issues presented in this case are:

1) whether the entry restrictions of the Limited Entry Act, AS 16.43.010–.380, violate the following provisions of the Alaska Constitution:

(a) article VIII, section 3, which reserves naturally occurring fish to the people for common use;

(b) article I, section 1, which guarantees all persons equal rights and opportunities;

2) whether the transferability provisions of the Limited Entry Act, under which entry permits can be sold or inherited, AS 16.43.150(h), and .170, violate

(a) article VIII, section 15 of the Alaska Constitution, prohibiting exclusive rights or special privileges of fishery;

(b) article VIII, section 3 of the Alaska Constitution, preserving naturally occurring fish to the people for common use;

(c) article I, section 1 of the Alaska Constitution, guaranteeing all persons equal rights and opportunities;

(d) the equal protection clause of the fourteenth amendment to the United States Constitution.

The superior court answered the questions designated above as 2(a) and (c) in the

affirmative. We answer all of them in the negative, and reverse.

## I. FACTS

When Harold Ostrosky and his two daughters, Lori and Julianne, operated salmon drift net gear in Bristol Bay without entry permits they were cited for illegal possession of commercially caught fish,[1] and illegal commercial fishing.[2]

The three went to trial and were convicted. Mr. Ostrosky was fined $10,000, with $9,000 suspended, and Lori and Julianne were each fined $5,000, with $4,500 suspended. In addition, the boat on which they were fishing, the Lori K.O., was or-dered forfeited to the state, with the forfeiture suspended for two years.

Lori and Julianne filed an application for post-conviction relief, claiming their convictions were invalid because the provisions of the Limited Entry Act regarding transfer of entry permits violated state and federal constitutional requirements. Mr. Ostrosky joined in this position. The superior court held that the transferability provisions of the Limited Entry Act violate article VIII, section 15 of the Alaska Constitution, prohibiting exclusive rights of fishery, and article I, section 1 of the Alaska Constitution, guaranteeing all persons equal rights and opportunities.[3] The court granted post-conviction relief to the Ostroskys.

1. 20 AAC 05.110 provides:
   PERMIT REQUIRED TO POSSESS FISH OR SHELLFISH. (a) It is unlawful for any person to possess, within water subject to the jurisdiction of the state, any fish or shellfish, taken for a commercial purpose, aboard a fishing vessel commonly used for taking that species of fish or shellfish unless the person has in his possession a valid interim-use or entry permit card allowing him to take the fish or shellfish in his possession with the gear with which the vessel is equipped unless waived by the commission for good cause.
   (b) As used in this section, a "commercial purpose" includes any sale, purchase, trade, gift, or any portion of a commercial transaction.

2. 20 AAC 05.100 provides:
   PERMIT REQUIRED TO OPERATE GEAR. (a) It is unlawful for any person to operate gear, within water subject to the jurisdiction of the state, for the commercial taking of any fishery resource without a valid interim-use or entry permit card issued by the commission authorizing that person to operate that type of gear in that fishery unless waived by the commission for good cause. To be valid, an interim-use permit or entry permit card issued by the commission must be signed in the space provided by the person named as the card holders [sic].

3. The court's decision relating to these issues states as follows:
   The defendants' state constitutional challenge involves two related arguments: first, that the Act's inheritance and transfer provisions create in permit holders an "exclusive right ... of fishery" in violation of Art. VIII, sec. 15, and second, that these provisions create a wealth and familial classification in violation of the Art. I, sec. 1 guarantee of equal treatment.

Article VIII, sec. 15, as amended in 1972, provides:
No exclusive right of fishery. No exclusive right or special privilege of fishery shall be created or authorized in the natural waters of the state. This section does not restrict the power of the state to limit entry into any fishery for purposes of resource conservation, to prevent economic distress among fishermen and those dependent upon them for a livelihood and to promote the efficient development of aquaculture in the state.
The Act was passed under the authority of this constitutional provision. The obvious tension between the ban on "exclusive rights or privilege of fishery" on the one hand and the grant of power to "limit entry into any fishery ... to prevent economic distress among fishermen and those dependent upon them for a livelihood ..." on the other hand is reflected in the Act which has as its purpose limitation of entry without "unjust discrimination." AS 16.43.010(a). The elaborate ranking system for the award of initial free permits, AS 16.43.200–.270, 20 AAC 05.-600–670, represents the legislative accommodation of this tension. This initial allocation system has been held to be constitutional. [*Commercial Fisheries Entry Commission v. Apokedak,* 606 P.2d 1255, 1261–68.]
An analysis of the Act in terms of Art. VIII, sec. 15 is not necessary, however, since the issue is subsumed in the equal protection analysis. Art. VIII, sec. 15 gives specific expression of the facts which go into the equal protection analysis. In *State v. Erickson,* 574 P.2d 1 (Alaska 1978) the court adopted the single equal protection test.
Initially, we must look to the purpose of the statute, viewing the legislation as a whole, and the circumstances surrounding it. It must be determined that this purpose is legitimate, that it falls within the police pow-

er of the state. Examining the means used to accomplish the legislative objectives and the reasons advanced therefor, the court must then determine whether the means chosen substantially further the goals of the enactment. Finally, the state interest in the chosen means must be balanced against the nature of the constitutional right involved. 574 P.2d at 12.

Article VIII, sec. 15 is the declaration by the people that the purpose of limiting entry into the fisheries is within the police power of the state, provided no exclusive right of fishery is created. The real question presented is whether the means by which the state limits entry bears a fair and substantial relation to the Act's purposes.

The nature of the right involved has been addressed by the court in *Apokedak* as an "... important right to engage in economic endeavor, which in some cases may involve the right to employment in the industry." 606 P.2d 1255 at 1266 (footnote omitted).

The purposes of the Act identified by the Supreme Court in *Apokedak* are: (1) enhancing the economic benefit to fishermen since too many involved in the industry prevented those relying on fishing for a livelihood from securing adequate remuneration; (2) conserving the fishery; (3) avoiding unjust discrimination in the allocation of a limited number of entry permits; and (4) administrative convenience. 606 P.2d at 1255. Does allocation of entry permits by the market and inheritance bear a fair and substantial relation to these legislative purposes?

The particular means of allocating permits is irrelevant to conservation of the fishery. That purpose is accomplished by controlling the catch. The allocation system is, therefore, irrelevant to achievement of this purpose.

The inheritance and transferability provisions of the Act clearly serve the purpose of promoting administrative convenience. Allowing the market and rules of descent and distribution to allocate permits avoids the necessity of a case by case ranking which was required for the initial award of permits. However, the purpose of promoting administrative convenience cannot alone outweigh the important right impinged by the statutory classification. 606 P.2d at 1266, footnote 45.

Allocation of permits by the market does not serve the purpose of avoiding unjust discrimination among those seeking permits. On the contrary, this system of allocation results in an unjust discrimination. Assuming a willing seller, the availability of permits is based solely on ability to pay. As noted by Justice Dimond in his concurring opinion in *Apokedak:*

This situation has the effect of creating another classification: on the one hand, the person with abundant financial resources, and on the other, a person of considerably more modest means. It seems to me that the Act is having the effect of favoring the well-to-do over the poor. In my opinion, this discrimination is basically unfair or unjust, and does not conform to the principle in article I, section 1 of our Constitution which requires equality of treatment of persons in the state. 606 P.2d at 1268–69.

In the initial ranking an applicant was awarded points by demonstrating the economic hardship which would result from exclusion from the fishery. AS 16.43.250. As the system now operates, wealth is the sole determinative factor. The provisions to avoid unjust discrimination in the initial award of permits have been stood on their head. Clearly, the market allocation of permits bears no relation, substantial or otherwise, to the just allocation of permits.

The state analogizes the market allocation of permits to the sale of alcoholic beverage licenses and subsequent sales of homestead lands. I find neither analogy compelling. Of principal importance is the fact that the people enjoy access to the state's fisheries which does not pertain in the case of alcohol. See Art. VIII, secs. 3 and 15, Constitution of Alaska. Since the "right" to hold a liquor license does not occupy a privileged constitutional position, the equal protection analysis is quite different. With regard to land sales, it is true that there are some superficial similarities, since subsequent allocations are by the market and inheritance. The analogy breaks down, however, because of two important differences. First, land, as property, has some intrinsic worth; and the allocation process bears a direct relation to this intrinsic value. The limited entry permit is a license, not property, AS 16.43.150, and has no intrinsic value. The market for limited entry permits is an entirely artificial creation of the allocation process. Second, the law regarding ownership and transfer of land is the product of historical conditions antedating the creation of the United States of America. The Constitutions of the United States and Alaska recognize this historical legacy and have been interpreted with reference to it. The Act is of recent vintage and the legislature explicitly avoided endowing the permit with the attributes of a property right. AS 16.43.150(e).

It may be argued that the allocation of permits by the market is necessary to allow the permit holder to recoup his investment in vessels and gear. However, market allocation bears only a tenuous relation to this purpose. First, the market price of the permit is dependent on the type of permit and the location of the fishery, and is not directly dependent on the vessel and gear owned by the transferor. Second, investment in vessels and gear is, or should be, a factor in the permit holder's decision to leave the fishery. The capital investment can be amortized over

The state appealed to the court of appeals which certified the appeal as appropriate for transfer to this court pursuant to AS 22.05.015(b) and Alaska R.App.P. 408(b). We accepted the certificate.

## II.  CONSTITUTIONALITY OF ENTRY RESTRICTIONS

Although the superior court struck down the Limited Entry Act on the grounds that its transferability provisions violate the Alaska Constitution, the Ostroskys have offered additional grounds for holding the Act unconstitutional. We consider these because a judgment may be affirmed on grounds different from those relied on by the trial court. *Moore v. State,* 553 P.2d 8, 21 (Alaska 1976); *Ransom v. Haner,* 362 P.2d 282, 285 (Alaska 1961).

We will first consider Harold Ostrosky's contentions concerning the validity of the entry restrictions of the Act. Those restrictions, in general, provide that no one can be the primary operator of commercial fishing gear without an entry permit. There are only a limited number of entry permits for each particular fishery. Following the implementation of the Act in 1973, entry permits were issued to those who had previously held gear licenses on a grandfather rights basis subject to detailed statutory and regulatory guidelines. *See generally Commercial Fisheries Entry Commission v.*

*Apokedak,* 606 P.2d 1255 (Alaska 1980). Commercial fishermen who had been crew members but not gear license holders were not eligible to receive entry permits in the initial allocation. AS 16.43.260(a). Under the Act, crew members need not have an entry permit as long as the holder of the entry permit is present when gear is operated. AS 16.43.140(b).

A.  *Article VIII, Section 3.*

Article VIII, section 3 of the Alaska Constitution provides:

Wherever occurring in their natural state, fish, wildlife, and waters are reserved to the people for common use.

Until it was amended in 1972, article VIII, section 15 provided:

No exclusive right or special privilege of fishery shall be created or authorized in the natural waters of the State.

In 1972 an additional sentence was added to section 15:

This section does not restrict the power of the State to limit entry into any fishery for purposes of resource conservation, to prevent economic distress among fishermen and those dependent upon them for a livelihood and to promote the efficient development of aquaculture in the State.

Harold Ostrosky argues (a) that section 3 of article VIII prohibits entry limitations

---

the life of the permit, the length of which is dependent on the holder. Provisions for emergency transfer of the permit mitigate any harshness due to illness or death of the holder.

The Act has as a purpose prevention of economic distress among fishermen and their dependents. A sizable capital investment is required to engage in commercial fishing. This investment was recognized in the initial ranking of applicants for free entry permits. AS 16.43.250(a)(1). See *Younker v. Alaska Commercial Fisheries Entry Commission,* 598 P.2d 917 (Alaska 1979). Vessels and gear unaccompanied by a permit to operate them are of relatively little value. The state limitation on entry to the fishery, also limited the market for vessels and gear. The Act recognizes the tie between permits and capital in AS 16.43.170(c) and AS 16.43.310– .320, under the buy-back programs both the permits and vessels and gear are purchased by the state.

Applying the [*State v.*] *Erickson* [574 P.2d 1 (Alaska 1978)] test and considering the goal to be obtained, protection of the investment, and the means selected, allocation by the market, and in light of the important right impinged, I find the Act does not bear a fair and substantial relation to the statutory purposes. I further find that the inheritance and transferability provisions of the Act have the effect of causing, rather than avoiding, unjust discrimination among those seeking permits. I find the Act unconstitutional under Art. I, sec. 1 of the Alaska Constitution, and hold that the defendants cannot be penalized for failure to possess the required permits, therefore necessitating a reversal of their convictions.

*Ostrosky v. State,* No. 3 AN–80–7652 Criminal (Alaska Super., August 14, 1981) (footnote omitted).

and (b) that the prohibition of section 3 has not been affected by the 1972 amendment to section 15. The first part of this argument is supported by judicial authority. In *Bozanich v. Reetz*, 297 F.Supp. 300, 306 (D.Alaska 1969), a three judge federal court held that a precursor of the present limited entry system, chapter 186, SLA 1968, was unconstitutional under both section 3 and section 15 of article VIII. This decision was vacated by the United States Supreme Court on abstention grounds, *Reetz v. Bozanich,* 397 U.S. 82, 90 S.Ct. 788, 25 L.Ed.2d 68 (1970). The parties then litigated the same question in state superior court, which held that section 3 and section 15 of article VIII, as well as section 1 of article I, prohibit limited entry.[4]

Like the courts in the *Bozanich* cases, we have difficulty squaring the section 3 reservation of fish to the people for common use with a system which grants an exclusive right to fish to a select few who may continue to exercise that right season after season. We accept, therefore, at least for the purposes of this case, the proposition that limited entry is inconsistent with the command of article VIII, section 3.

We proceed to an examination of the second part of Harold Ostrosky's argument, namely that the amendment to article VIII, section 15 did not eliminate the prohibition on limited entry implicit in article VIII, section 3. This argument is textually correct, for the language of the amendment only refers to section 15. However, the conclusion is inescapable that the purpose of the amendment was to authorize, so far as the state constitution is concerned, a limited entry system. No other purpose seems reasonably possible.

Our conclusion is supported by the history of the 1972 amendment. As introduced by the Governor and as passed by the Senate, the language of the proposed amendment was stated in the affirmative: "The state may restrict entry to any fishery...."[5] As so written, there would be no question

but that limited entry would be constitutional as a matter of state constitutional law, despite any contrary provisions of the state constitution. The House Resources Committee changed the language to its present negative form. The Committee report explaining this action makes it clear, however, that the Committee did not intend to constrict in any way the sweep of the amendment. Thus, the report states with approval the purpose of the amendment: to "give the state the power to restrict entry into a fishery for certain public purposes." The report continues:

> In his testimony to the committee the Attorney General, Mr. Havelock, suggested that an amendment of this nature is essential if Alaska is to ever have an economically healthy fishing industry. For more than a decade fisheries economists have been calling for such an institutional change, and over the past few years the fishermen themselves have come to recognize that this amendment, though no panacea, is an essential first step to revitalization of the fishing industry in Alaska.

After so endorsing limited entry the report proceeded to explain the Committee's substituted language:

> After carefully studying the new language proposed in the Senate Resolution, your committee has adopted a substitute which alters the wording of the amendment in three small but significant ways.

Only the first change concerns the change from a positive to a negative form of expression. The report continues:

> In the case of *Reetz v. Bozanich,* the U.S. Supreme Court held that a statute limiting entry into a fishery creates an exclusive right of fishery. As a consequence, the meaning of the new language, which the Senate proposes to add as a second sentence in Section 15, is not as clear as it could be. In order to eliminate any confusion or ambiguity we have altered this

---

4. *Bozanich v. Norenberg,* No. 70–389 Civil (Alaska Super., 1st Dist., Juneau, March 8, 1971) per Judge Carlson.

5. 1971 Senate Joint Resolution No. 10.

new language to show that the state's power to limit entry is a specific exception to the "exclusive right" prohibition. 2 House Journal 760–61 (1971).

Thus, the purpose of the House Committee in altering the affirmative language of the Senate Joint Resolution to the negative form which found its way into the amendment was to clarify perceived ambiguities, not to restrict the meaning of the Senate Joint Resolution.

■ We conclude that the purpose of the amendment to article VIII, section 15 was to grant the state the power to impose a limited entry system in any fishery, notwithstanding any state constitutional provisions otherwise prohibiting such a system. Therefore, Harold Ostrosky's argument that the entry provisions of the Act violate article VIII, section 3 of the Alaska Constitution must fail.

### B. *Article I, Section 1.*

■ Article I, section 1 of the Alaska Constitution states the principle that "all persons are equal and entitled to equal rights, opportunities, and protection under the law . . . ." Harold Ostrosky's argument that the entry restrictions of the Act violate this clause is similar to his argument relating to article VIII, section 3. He argues that the superior court in the second *Bozanich* case held that the 1968 precursor to the

present Act violated article I, section 1, that this conclusion was correct, and that article I, section 1 was not amended by implication by the 1972 amendment to article VIII, section 15. For the reasons we have expressed above with respect to the argument concerning article VIII, section 3, this argument is rejected. The authority to impose some limited entry system became in 1972 a part of Alaska's constitution. The amendment granting that authority cannot, in turn, be challenged as unconstitutional under preexisting clauses in the same document.[6]

### III. CONSTITUTIONALITY OF TRANSFERABILITY PROVISIONS

AS 16.43.170(b) provides in pertinent part:

[T]he holder of an entry permit may transfer his permit to another person or to the [Commercial Fisheries Entry Commission] upon 60 days notice of intent to transfer under regulations adopted by the commission. No sooner than 60 days nor later than 12 months from the date of notice to the commission, the holder of an entry permit may transfer his permit. If the proposed transferee, other than the commission, can establish present ability to participate actively in the fishery, the commission shall approve the transfer

---

**6.** Harold Ostrosky raises two other points. (1) He argues that even if a limited entry program is constitutionally permissible, the current act does not further the purposes expressed in the amendment to article VIII, section 15 and is therefore invalid. However, the role of the judiciary is not to invalidate acts of the legislature because in retrospect the acts have arguably failed to achieve the purposes for which they were enacted. Rather, our role is to examine whether the legislature could reasonably have expected that the Limited Entry Act would advance the purposes of article VIII, section 15. *See Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 464, 101 S.Ct. 715, 723, 66 L.Ed.2d 659, 668–69, *reh'g denied,* 450 U.S. 1027, 101 S.Ct. 1735, 68 L.Ed.2d 222 (1981); *Vance v. Bradley,* 440 U.S. 93, 111–12, 99 S.Ct. 939, 949, 59 L.Ed.2d 171, 184–85 (1979). No argument has been made that this

test is not satisfied, nor do we believe that any such argument would be reasonable. As we stated in *Commercial Fisheries Entry Comm'n v. Apokedak,* 606 P.2d 1255, 1263 (Alaska 1980):

The overall economic and conservation goals of the Act [which are the same as the constitutional goals] are met by limiting the numbers of permits.

(2) He argues that the Limited Entry Act is a burden on interstate commerce in violation of the commerce clause of the United States Constitution. The argument is so cursory that it is incomprehensible to us. Accordingly, we do not consider it. *See State v. O'Neill Investigations, Inc.,* 609 P.2d 520, 528 (Alaska 1980); *Lewis v. State,* 469 P.2d 689, 691 n. 2 (Alaska 1970); *Pedersen v. State,* 420 P.2d 327, 330 nn. 4–5 (Alaska 1966).

and reissue the entry permit to the transferee.[7]

AS 16.43.150(h) provides:

Upon the death of an entry permit holder, the permanent permit shall be transferred by the commission directly to the surviving spouse by right of survivorship unless a contrary intent is manifested. When no spouse survives, the rights of the decedent pass as part of his estate.

Lori and Julianne Ostrosky do not attack the entry restriction aspect of limited entry. Instead, they contend the above transferability provisions are unconstitutional. Their argument is that these provisions exclude those who do not have sufficient assets to purchase an entry permit and who have not inherited one. This, they contend, amounts to an unconstitutional classification based on wealth and lineage. They also argue that the transferability provisions themselves create an exclusive right or special privilege of fishery barred by the first sentence of article VIII, section 15 and by the common use clause, article VIII, section 3. They suggest that a transfer system meeting the requirements of the constitution would be one in which a permit would revert to the state when the permit holder dies or is no longer using it. Reissuance could be accomplished either under a type of apprenticeship system, emphasizing past participation in commercial fishing as a crewmember, or a lottery, or a combination of both. For convenience we will refer to the existing system as "free transferability" and to the type of system proposed by Lori and Julianne Ostrosky as a "reversion—reissuance" system.

A. *Article VIII, Sections 3 and 15—The Least Exclusive Alternative Contention.*

One interesting argument made by Lori and Julianne Ostrosky is based on the tension between article VIII, section 3 and the first sentence of article VIII section 15 on the one hand, and the amendment to section 15 on the other. This argument concedes that some limited entry system is constitutionally permissible because of the amendment. However, since the common use clause of section 3 and the no exclusive right of fishery clause of section 15 remain in the constitution, the premise of the argument is that whatever system of limited entry is imposed must be one which, consistent with a feasible limited entry system, entails the least possible impingement on the common use reservation and on the no exclusive right of fishery clause. The argument concludes that free transferability does not entail the least possible impingement on the anti-exclusionist values which these provisions reflect.

Since "[i]t is a well accepted principle of judicial construction that, whenever reasonably possible, every provision of the Constitution should be given meaning and effect, and related provisions should be harmonized," *Park v. State,* 528 P.2d 785, 786–87 (Alaska 1974), the premise of this argument is logical. However, the conclusion that free transferability is more exclusive than a reversion-reissuance system has not been demonstrated.

■ Given a finite number of permits for each of the several fisheries subject to the Act, it is not evident that free transferability constitutes a greater impingement on the nonexclusive, common use goals of article VIII than a system of reversion and reissuance. In a system of free transferability there will be those who are unable to afford a permit.[8] However, in a reversion and reissuance system where reissuance is by lottery there will be those who are excluded by chance. Similarly, if reissuance is based

---

7. The present ability requirement is not a stringent one. It requires only that "the person is physically able to harvest fish in the fishery and has reasonable access to commercial fishing gear of the type utilized in that fishery." 20 AAC 05.770(5).

8. For the last quarter of 1981 the average price for a permit was approximately $50,000. For some fisheries average prices were much higher, ranging upwards to $100,000. Commercial Fisheries Entry Comm'n, 1981 Quarterly Permit Price Information (1982). Permits are, however, often transferred. In each of the years 1980 and 1981 about 1,000, or 10% of the existing permits, were transferred, primarily by sale. Commercial Fisheries Entry Comm'n, Commercial Fisheries Entry Permit Transfers, 1980 and 1981 (1982).

on an apprenticeship system there will be those who are excluded because, while they may be fit enough to fish, they are not hired by existing permit holders as crew members because stronger and younger help is available, or for other reasons. Exclusion from participation as a gear license holder in a fishery is not more violative of the common use or the no exclusive right of fishery clauses because it is based on one's financial rather than physical standing, or on the laws of chance.[9] We thus reject the Ostroskys' contentions that free transferability violates article VIII, sections 3 and 15.

### B. *Equal Protection.*

■ Three standards of review are commonly utilized in cases involving the equal protection clause of the fourteenth amendment to the United States Constitution. First, where suspect classifications (i.e., those based on race, national origin, or alienage) or fundamental rights (e.g., voting, litigating, or the exercise of intimate personal choices)[10] are involved, differential treatment will be upheld only when the purpose of the enactment furthers a "compelling state interest" and the enactment itself is "necessary" to the achievement of that interest. This is often called the strict scrutiny standard.[11] Second, where classifications are based on gender or illegitimacy, the purpose of the enactment must be "im-

portant," and the means used to accomplish that purpose must be "fairly and substantially" related to its accomplishment. *Craig v. Boren,* 429 U.S. 190, 197–98, 97 S.Ct. 451, 456–57, 50 L.Ed.2d 397, 407 (1976), *reh'g denied,* 429 U.S. 1124, 97 S.Ct. 1161, 51 L.Ed.2d 574 (1977); *see also Lalli v. Lalli,* 439 U.S. 259, 265, 99 S.Ct. 518, 523, 58 L.Ed.2d 503, 509 (1978). This is regarded as an intermediate level of review. Third, in cases not involving suspect classifications, the infringement of fundamental rights, or classifications based on gender or illegitimacy, differential treatment must be based on a governmental interest which is "legitimate," and the enactment must be "rationally" related to its achievement.[12] In our discussion of federal equal protection we have called this the rational basis test. *Isakson v. Rickey,* 550 P.2d 359, 362 (Alaska 1976).

■ The approach we have taken under the state equal protection clause is somewhat different. In contrast to the rigid tiers of federal equal protection analysis, we have postulated a single sliding scale of review ranging from relaxed scrutiny to strict scrutiny. The applicable standard of review for a given case is to be determined by the importance of the individual rights asserted and by the degree of suspicion with which we view the resulting classifica-

---

**9.** The system of termination of permits after a specified term of years during which the holder "may be expected to recoup his investment in gear and vessel and realize a reasonable return," suggested by the dissent entails permit reissuance, probably on the basis of a lottery. The reissuance aspect of such a system, if based on a lottery, would be subject to the comments which we have made above. Likewise, if reissuance were based on a type of apprenticeship system, our comments above would also be applicable. Additionally, such a system would be of questionable feasibility. For most fishermen commercial fishing is a career choice. It would work an obvious hardship on a gear license holder whose permit expired after, for example, ten years, to then force him out of his chosen career. This would be similar to restricting a license to practice law or medicine to a limited period after which the practitioner would have to make way for others and embark upon a second career. Fur-

ther, the system suggested by the dissent would tend to lock a fisherman into owning only one vessel during his fishing career. It would be difficult for a fisherman having only three or four years left on his license to finance the acquisition of a new vessel. Moreover, the fixed termination aspect of such a system would tend to foster exploitation, rather than conservation, of the fisheries.

**10.** L. Tribe, American Constitutional Law § 16.7 (1978).

**11.** *See, e.g., Kramer v. Union Free School Dist. No. 15,* 395 U.S. 621, 626–27, 89 S.Ct. 1886, 1889, 23 L.Ed.2d 583, 589 (1969).

**12.** *Harris v. McRae,* 448 U.S. 297, 324, 100 S.Ct. 2671, 2692, 65 L.Ed.2d 784, 809, *reh'g denied,* 448 U.S. 917, 101 S.Ct. 39, 65 L.Ed.2d 1180 (1980).

tion scheme.[13] As legislation burdens more fundamental rights, such as rights to speak and travel freely, it is subjected to more rigorous scrutiny at a more elevated position on our sliding scale. Likewise, laws which embody classification schemes that are more constitutionally suspect, such as laws discriminating against racial or ethnic minorities, are more strictly scrutinized. This approach was first announced in *State v. Erickson*, 574 P.2d 1, 11–12 (Alaska 1978), where we stated:

> In applying the Alaska Constitution, however, there is no reason why we cannot use a single test. Such a test will be flexible and dependent upon the importance of the rights involved. Based on the nature of the right, a greater or lesser burden will be placed on the state to show that the classification has a fair and substantial relation to a legitimate governmental objective. Where fundamental rights or suspect categories are involved, the results of this test will be essentially the same as requiring a "compelling state interest"; but, by avoiding outright categorization of fundamental and nonfundamental rights, a more flexible, less result-oriented analysis may be made.

(Footnote omitted).

■ Having selected a standard of review on the *Erickson* sliding scale, we then apply it to the challenged legislation. This is done by scrutinizing the importance of the governmental interests which it is asserted that the legislation is designed to serve and the closeness of the means-to-ends fit between the legislation and those interests. As the level of scrutiny selected is higher on the *Erickson* scale, we require that the asserted governmental interests be relatively more compelling and that the legislation's means-to-ends fit be correspondingly closer. On the other hand, if relaxed scrutiny is indicated, less important governmental objectives will suffice and a greater degree of over/or underinclusiveness in the means-to-ends fit will be tolerated.[14] *Compare Vogler v. Miller*, 660 P.2d 1192 (Alaska 1983) *with Rose v. Commercial Fisheries Entry Commission*, 647 P.2d 154 (Alaska 1982). As a minimum, we require that the legislation be based on a legitimate public purpose and that the classification "be reasonable, not arbitrary, and . . . rest upon some ground of difference having a fair and substantial relation to the object of the legislation. . . ." *Isakson v. Rickey*, 550 P.2d at 362 (quoting *State v. Wylie*, 516 P.2d 142, 145 (Alaska 1973)).

The individual interest asserted in Ostroskys' challenge to the transferability provisions of the Act is not of a high order. The interest is that of obtaining the right to fish as a gear license holder by lottery or apprenticeship rather than by purchase or inheritance. The system advocated by the Ostroskys would exclude on the basis of one's ability to be hired as a crewman, a matter on which age and strength are often determinative factors, or on the basis of

---

**13.** The flexible scale we use resembles the "spectrum of standards" of which Justices Marshall and White have written with respect to federal equal protection. *San Antonio Independent School Dist. v. Rodriguez*, 411 U.S. 1, 98–99, 93 S.Ct. 1278, 1329–30, 36 L.Ed.2d 16, 81 (Marshall, J., dissenting), *reh'g denied*, 411 U.S. 959, 93 S.Ct. 1919, 36 L.Ed.2d 418 (1973); *Vlandis v. Kline*, 412 U.S. 441, 458–59, 93 S.Ct. 2230, 2239–40, 37 L.Ed.2d 63, 75 (1973) (White, J., concurring). As Justice White has put it: "[I]t must now be obvious, or has been all along, that, as the Court's assessment of the weight and value of the individual interest escalates, the less likely it is that mere administrative convenience and avoidance of hearings or investigations will be sufficient to justify what otherwise would appear to be irrational discriminations." *Id.*

**14.** Other language in *Erickson* suggests that a balancing of the individual rights asserted against the state's objective is to take place as a process separate from the identification and application of the appropriate standard of review. *Id.* at 12. Such a process is neither useful nor necessary because the selection of the standard of review on the sliding scale reflects an assessment of the importance of the individual rights, and the standard when selected posits the degree of importance which the government objective must have and the required closeness of fit between the means used to achieve that objective and its achievement. Thus, balancing is inherent in the process of selection and application of the standard of review and is not itself a separate step.

pure chance, while the present system excludes those who are unable to afford a permit and those who do not inherit one.

While the current system may thus discriminate on the basis of wealth, it does so only in the manner that any price does. As Professor Tribe has observed: "Judicial intervention to redress poverty on the basis of equal protection is therefore in constant danger of becoming either wholesale or unprincipled...." [15] This may be the reason why cases striking down fees for government supplied services or privileges as discriminating against the poor have been limited to instances where fundamental rights such as access to the courts,[16] and ballots [17] have been burdened.

■ An entry permit is a government license having value issued to a limited number of people. As such it resembles a liquor license, or a permit to operate a trucking firm over a given route, or a utility franchise, or a broadcast license. While these privileges are both purchasable and inheritable, the fact that the poor cannot buy them is wealth discrimination only in the general sense that all prices discriminate in a society where wealth is distributed unequally. Further, the fact that the poor seldom inherit such privileges is lineage discrimination only in the sense that laws permitting inheritance of anything of value are discriminatory. Since the wealth and lineage classifications presented here are not different from those which pervade our system of private property, we do not place the interest asserted by the Ostroskys—redistribution of entry permits based on a system free of these classifications—in an elevated position on the *Erickson* sliding scale. It follows, of course, that the rational basis test is the appropriate standard for this federal constitutional claim.

The state argues that free transferability serves the following objectives:

—By making permits inheritable and transferable among family members, the Act ensures that a fishing family will be able to continue to fish if the permit holder dies or is disabled, thus protecting the family's source of income and its investment in vessel and gear. This prevents economic distress among fishermen and those dependent upon them for a livelihood.

—By making it possible for a person who has fished one permit to purchase a different one, the Act allows fishermen to move to more profitable gear types (from hand troll to purse seine, for instance) and to fish a different area when their usual area has bad runs. This prevents economic distress among fishermen, and retains the traditional mobility....

—By making permits salable, the Act creates a market for them. Price depends largely on the state of the fishery.... Thus, in order to keep the fisheries healthy, fishermen will obey conservation laws, assist in the apprehension of violators of those laws, and willingly contribute to aquaculture programs.

—By giving permit holders an incentive—money—to transfer their permits, the Act prevents the creation of a closed class of fishermen.... [T]he number of transfers to date has been very large.

—By making the acquisition of a permit certain by payment of the purchase price, the Act allows fishermen to plan where they will fish, what type of gear they will use and what investments in vessels and gear they can prudently make.

—By not setting up any complex eligibility formulas for new entrants, the Act makes the transfer system readily understandable to those it will affect.

—By not requiring the Commission to get involved in transfers to an extent beyond the simple processing of transfer applications and the certification that the proposed transferee has the present ability

---

**15.** L. Tribe, American Constitutional Law § 16–42 (1978).

**16.** *Griffin v. Illinois,* 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956).

**17.** *Bullock v. Carter,* 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972).

to fish, the Act eases the Commission's administrative burden, and allows it to focus its attention on other necessary duties, such as the setting of optimum numbers for limited fisheries and the decision whether presently open fisheries should be limited.

Free transferability, in other words, is meant to prevent hardship when a permit holder dies or becomes disabled; allow gear license holders to move from one fishery or type of gear to another; advance the causes of conservation, aquaculture, and adherence to fish and game laws by giving gear license holders a stake in the resource; increase the number of permits that are transferred; and ease administrative burdens on the state.

The opinion of the superior court, and the arguments of the Ostroskys, focus not on the foregoing purposes but on those identified in *Commercial Fisheries Entry Commission v. Apokedak,* 606 P.2d 1255, 1265 (Alaska 1980), namely, (1) enhancing the economic benefit to fishermen; (2) conserving the fishery; (3) avoiding unjust discrimination in the allocation of a limited number of entry permits; and (4) administrative convenience. While the objectives identified by the state are by no means unrelated to those expressed in *Apokedak,* the latter should be understood to be the overall objectives of a limited entry system.

Once the decision to institute a limited entry system is made, the question of how entry permits are to be transferred necessarily must be answered. The purposes of the transfer method will not necessarily be identical to the general purposes of limited entry. As we noted in *Apokedak,* 606 P.2d at 1264 & n. 39:

> Seldom, if ever, will a statutory scheme, especially one as complicated as the Limited Entry Act, have a single monolithic purpose. The legislature usually acts with a variety of purposes in mind and each of these purposes deserves judicial recognition.[39]

[39] This is not to say that the judiciary is required to hypothesize or invent purposes, something *Isakson's* intensified scrutiny test

specifically rejects. Close examination of the statutory scheme will usually yield several concrete legislative purposes having a substantial basis in reality, even if these purposes are not specifically identified in a statutory purpose clause.

■ Each of the objectives identified by the state as purposes of free transferability was discussed in the extensive legislative hearings preceding passage of the Act. Thus, they may not be regarded as after the fact hypotheses. Further, the objectives are legitimate and they are fairly and substantially furthered by free transferability. We hold, therefore, that the equal protection clause of the state constitution is not violated by the transfer provisions of the Act.

The same analysis is applicable, and yields the same conclusion as to federal equal protection.

The judgment of the superior court is REVERSED.

RABINOWITZ, Justice, dissenting.

I.

I agree with the majority's suggestion that the conflict in constitutional provisions in this case is properly resolved by allowing the legislature to adopt a system of limited entry, but only through the means which are least restrictive upon other rights guaranteed in the constitution. Beyond the statement of this principle, however, I cannot agree with the application given the less restrictive alternative test to the "free transferability" system implemented by AS 16.43.170(b) and 16.43.150(h).

Free transferability impairs rights guaranteed by three separate clauses of the Alaska Constitution. The "common use" clause in Article VIII, section 3 provides:

> Wherever occurring in their natural state, fish, wildlife, and waters are reserved to the people for common use.

The first sentence of Article VIII, section 15 states:

> No exclusive right or special privilege of fishery shall be created or authorized in the natural waters of the State.

Finally, Article I, section 1 provides that "all persons are equal and entitled to equal rights, opportunities, and protection under the law." [1]

In the absence of legislation pursuant to the second sentence of Article VIII, section 15, [2] the "resource" of the gear fisheries is reserved to the people for common use. The common use clause necessarily contemplates that resources will remain in the public domain, and will not be ceded to private ownership. Since the right of common use is guaranteed expressly by the constitution, it must be viewed as a highly important interest running to each person within the state. [3]

The enabling language of Article VIII, section 15 makes some inroads upon the application of the common use clause to the gear fisheries. Any system of limited entry, no matter how it is effectuated, will at any one time exclude a portion of the population from the resource. This observation, however, does not warrant the further conclusion that the common use clause is rendered a nullity with respect to entry legislation. In my view, Article VIII, section 3 still mandates that limited entry be achieved through the least possible "privatization" of the common resource.

Examined in these terms, free transferability makes the Limited Entry Act the most restrictive scheme possible under the common use clause. The ability to use and derive value from the gear fishery resource is dependent upon possession of a gear license, and these licenses are designed to operate as private property. The initial "grantees" enjoy the ability to sell, assign, or pass on to their heirs their share of the gear fishery resource. Most importantly, the holder's right to the license never expires; the holder's heirs may hold it forever. Alternatively, they may sell it and realize a return based upon its value as an asset held in perpetuity. Under the free transferability system, none of the value of the resource is retained or ever returns to the state and the people.

In addition, I conclude that AS 16.43.-170(b) and 16.43.150(h) create an "exclusive" right or "special privilege" within the meaning of Article VIII, section 15. Initial grantees were presented with a windfall at the expense of all other persons in the state. Public rights were extinguished in order to create exclusive private interests of sometimes enormous value. Under the equal protection clause, the populace was divided into two categories: those who would receive this great boon from the state, and those who would forever lose their share in the resource unless they someday "bought it back" through the purchase of a gear license.

Given the infringements upon the constitutional interests which I have described, free transferability would still be permissible under Article VIII, section 15 if it were necessary to a feasible system of limited entry. I believe, however, that the Ostroskys have presented a substantially less restrictive alternative that furthers all of the purposes which underlie free transferability.

The Ostroskys' principal objection to free transferability is that licenses never expire.

1. See also the "natural resources equal protection clause" in Article VIII, section 17.

2. Article VIII, section 15, provides in relevant part:

This section does not restrict the power of the State to limit entry into any fishery for purposes of resource conservation, to prevent economic distress among fishermen and those dependent upon them for a livelihood and to promote the efficient development of aquaculture in the State.

As noted by the majority, without this enabling language the entire limited entry statute would likely be unconstitutional.

3. I would hold that the state bears a high burden of showing the substantiality of its interests throughout our equal protection examination. Thus, I specifically disagree with the majority's conclusion that "[t]he individual interest asserted in appellants' challenge to the transferability provisions of the Act is not of a high order." In addition to the common use clause, see Commercial Fisheries Entry Comm'n v. Apokedak, 606 P.2d 1255, 1266 (Alaska 1980) ("important right to engage in economic endeavor"); see also Hilbers v. Municipality of Anchorage, 611 P.2d 31, 40 (Alaska 1980).

One alternative they suggest is that licenses should be issued only for a term of years, reverting to the state for redistribution upon expiration. In this way, the state would recapture control of the resource periodically and reassign it to the legislatively-determined appropriate recipients. Thus, the common resource would not be transferred forever to a discrete private class. The state and the people would have the recurring ability to allocate use rights.[4]

Under the proposed alternative, the length of the license term would be a matter for the discretion of the legislature, within constitutional limits. Article VIII, section 15 authorizes the state to create a limited entry scheme designed "to prevent economic distress among fishermen and those dependent upon them for a livelihood." This authorizes the state to define licenses in a way that makes it economically practical for license holders to fish. Given this authorization, the constitution recognizes that licenses may be granted for a sufficiently long period that the holder may be expected to recoup his investment in gear and vessel, and realize a reasonable return. Any license which goes beyond the level of reasonable economic attractiveness, and does so at the expense of the constitutional rights of others, is prohibited.

Similarly, the method of redistribution following expiration is also a matter of legislative choice, to be exercised within constitutional bounds. One proposal made by the Ostroskys is that reissuance should be made by lottery. This would prevent any danger of the licenses remaining in the hands of a closed class. Any plan which effectively guaranteed renewal would be subject to the same criticisms leveled at the current free transferability plan.

The Ostroskys' suggestion does not actually require any change in the existing transferability scheme. Licenses may still be sold and inherited. The crucial difference is in the nature of the thing transferred. Licenses would resemble a lease interest in the resource as opposed to an outright ownership interest. They would still have value—possibly considerable value—and that value would be privately held. The distinguishing feature of free transferability with expiration is that something of the people's common use rights are still held by the state. Privatization of the common use interest is not effected to a degree well beyond what is necessary to implement an economically feasible limited entry system.

Because the Ostroskys have proposed an alternative for a feasible entry system which is less restrictive of the public's rights in the gear fishery resource, I would hold that the present statute is invalid under Alaska's Constitution.[5]

## II.

I further disagree with the majority's discussion of the state's interest in the goals furthered by AS 16.43.170(b) and 16.43.-150(h). The court's opinion appears to dismiss the importance of the overall objectives of the limited entry statute to the equal protection scrutiny of transferability

**4.** The Ostroskys' "free transferability plus expiration" alternative serves all of the purposes advanced in support of the existing scheme. The alternative "prevents economic distress among fishermen and those dependent upon them" by protecting the family's source of income during the life of the permit even if the original holder dies or is disabled. It retains the "traditional mobility" of fishermen by allowing for the sale of limited-term permits. It encourages conservation of the fisheries by license-holders, who still have a direct economic stake in the health of their fishery. It discourages the creation of a closed class of fishermen by making this impossible; transfers of permits are still encouraged by the possibility of sale for money. It allows for planning and prudent investment by making the acquisition of a permit certain by the payment of the purchase price. It does not unduly complicate the transfer scheme. It retains the feature of limited involvement in transfers on the part of the CFEC. The commission's burden is increased only in that it must periodically reissue the licenses. In my opinion, free transferability plus expiration advances all of the above state goals equally as well as does the existing scheme of free transferability minus expiration.

**5.** Alternatively, I would order supplemental briefing in the case to allow the state to address the alternative of free transferability plus expiration.

**1198**

provisions. It is true that specific sections within a complex statute will be designed to serve narrow purposes subsidiary to the statute's larger goals. It is also true that these narrow purposes may properly be asserted by the state in attempting to meet its burden under the state equal protection clause. The legitimacy of these subsidiary purposes, however, is seriously undermined if they are found to conflict with the greater goals of the statutory scheme as a whole.

Under AS 16.43.010, the legislature has declared that "[i]t is the purpose of this chapter to promote the conservation and the sustained yield management of Alaska's fishery resource and the economic health and stability of commercial fishing in Alaska by regulating and controlling entry into the commercial fisheries in the public interest and without unjust discrimination." This statement of legislative intent does more than provide that one goal of the Limited Entry Act is to comport with the constitution. Decisions of this court have made it clear that the statute's policy of avoiding unjust discrimination extends further than to classifications forbidden by the constitution. *Commercial Fisheries Entry Commission v. Apokedak,* 606 P.2d 1255, 1268 (Alaska 1980).

In evaluating the strength of the state's interest in the goals behind the system of free transferability, it is incumbent upon this court to weigh the Ostroskys' argument that the legislatively-created "free market" for gear licenses discriminates on the basis of wealth.[6] I would hold that the broad statutory anti-discrimination purpose of the Limited Entry Act militates against any system of transferability which makes gear licenses available only to the extremely wealthy. Certainly the state's interest in the current transferability provisions is diminished by the provisions' tendency to create such a classification.

---

**6.** I am also in disagreement with the court's observations that the Limited Entry Act discriminates on the basis of wealth only in the manner that any price does, and I further disagree that liquor licenses and utility franchises furnish appropriate analogues. These assump-

tions overlook the constitutional status of the right allocated by the Limited Entry Act and the fact that here the relevant "free market" is one which was created legislatively and one which perpetuates and aggravates economic disparities.