ESTATE OF Julie MINER, Appellant,

v.

COMMERCIAL FISHERIES ENTRY
COMMISSION, State of
Alaska, Appellee.

No. 5399.

Supreme Court of Alaska.

Nov. 6, 1981.

David B. Snyder and James G. Robinson,
Alaska Legal Services Corporation, Kodiak,
for appellant.

Ann E. Prezyna, Asst. Atty. Gen., Wilson
L. Condon, Atty. Gen., Juneau, for appellee.

Before RABINOWITZ, C. J., and CON-
NOR, BURKE, MATTHEWS and COMP-
TON, JJ.

## OPINION

RABINOWITZ, Chief Justice.

This case is an appeal from a superior court ruling upholding a denial without hearing of an application for a Limited Fishery Entry permit by the Commercial Fisheries Entry Commission. (CFEC) We conclude that appellant has not demonstrated that the denial of decedent Julie Miner's application without a hearing was improper.

## I. INTRODUCTION

Julie Miner was eligible to apply during the initial application period, under the Limited Fisheries Entry Act,[1] but failed to do so, and then attempted to apply during the later application period[2] which the CFEC established for those individuals whom we held in *Isakson v. Rickey*, 550 P.2d 359 (Alaska 1976), to have been wrongfully denied the right to apply. The CFEC, because Ms. Miner had not held a gear license for the first time in 1973 or 1974 and thus was not a direct beneficiary of the *Isakson* decision, denied her application without a hearing under the "misadvice or lost in the mail" policy.

1. December 19, 1974, to March 18, 1975. 20 AAC 05.510(a).

2. January 15, 1977, to September 30, 1977. 20 AAC 05.510(f).

3. However, as discussed more fully *infra*, this point may be subject to dispute. The CFEC distributes permits based on a multi-variable formula designed to approximately gauge the "hardship" which an applicant would face if denied a permit. The formula includes consideration of such factors as prior participation as a gear license holder, prior participation as a crew member, and economic dependence on a fishery. Under the regulations, only those with over 20 points on this scale are automatically entitled to a permit; the remainder of the permits for a particular fishery are then distributed in descending order of point scores until the previously determined number of permits allowable are all distributed.

Thus, although Miner's 17.5 points would have entitled her to a permit under the current point spectrum for this particular fishery, this would not be the case had a substantial number of applicants had higher point scores; as the CFEC points out, if it is required to consider

Julie Miner had a long career of Bristol Bay drift gill net salmon fishing, and an almost equally long history of mental illness. Miner had fished in the Bristol Bay drift gill net salmon fishery since at least 1965, and had participated as a crew member in 1965–68 and as a gear license holder in 1969–70 and 1973–74. As of January 1, 1973, she was a resident of Dillingham, and owned jointly with her husband two drift vessels and one drift skiff and drift gear. It appears that, had she filed her application on time, she would have received a permit, in that she qualified for 17.5 points, whereas the entitlement level for that particular fishery was 17 points.[3]

At the time of the initial permit application period (December 19, 1974, to March 18, 1975), Miner and her husband each received a "yellow card"—a form which they could return to obtain a partially pre-printed application. Her husband, with the help of a CFEC agent, completed and filed his application, but Miner refused to do so. Apparently (and, for purposes of this appeal, we can assume) the reason for this refusal was her mental illness.[4] Medical records in the record show that she was sporadically hospitalized at Alaska Psychi-

and honor a significant number of late applications, then Miner's entitlement might be in question.

4. Miner was hospitalized for three weeks in 1968 with a diagnosis of depressive reaction (in remission) and of long-standing hysteria with obsessive/compulsive components, decompensating. She was admitted again on August 3, 1974, with a diagnosis of paranoid psychosis, and a later final diagnosis of involutional psychotic depression, improved; hysterical personality; alcoholism; iron deficiency anemia, improved; and neurodermatitis of the face, improved. She was seen once as an outpatient in the summer of 1975, and once again in the summer of 1976. She was hospitalized again in API on September 30, 1976, following an incident in which she threatened a telephone repairman with a loaded gun, apparently based upon some paranoid delusion. She was found incompetent to stand trial, and to have lacked substantial capacity to appreciate the wrongfulness of her conduct; the diagnosis was schizophrenia, paranoid type. She was discharged on November 18, 1976, with a favorable prognosis if she stayed on her medication.

atric Institute over a period of years. While there is no direct medical diagnosis of Miner's mental state during the application period itself, an affidavit from her husband states that she was violently opposed to filling out the form because she thought the Limited Entry Program and the Department of Fish & Game to be communistic. Her husband decided to let the matter ride until she was in a more normal state of mind. Miner did, in fact, file an application on April 5, 1977, during the *Isakson* application period of January 15, 1977, to September 30, 1977.

This application was denied on June 8, 1977, originally on the ground that Miner had not actively harvested the fishery while participating as a gear license holder in 1973 or 1974. Represented by counsel, she requested a hearing on July 19, 1977. This was granted, and the hearing scheduled for November 17, 1977. At the hearing, the hearing officer found evidence of a pre-1973 gear license held by Miner, which rendered her ineligible to apply during the *Isakson* application period. This changed the ground of a denial to that of late application. Miner's representative was granted a continuance to meet the new issue, and set about gathering the medical evidence in the record to prove that she had been mentally unfit during the original application period. This material was submitted to the CFEC. On May 10, the hearing officer wrote to Miner's representative asking if more specific information was available regarding her mental status during the actual application period. (This may have been before Mr. Miner's affidavit was submitted.) However, on May 25, the CFEC denied any hearing, because:

Your application was submitted considerably past the final deadline for submission, and the materials you have submitted in support of this late application fail to establish a claim that you actually submitted an earlier, timely application that was lost or that you were advised by an agent of the Commission not to apply. Under these circumstances, the hearing must be denied.[5]

Miner appealed to the superior court, proffering arguments based on due process (U.S.Const.Amend. XIV; Alaska Const. art. I, § 7), equal protection (U.S.Const.Amend. XIV; Alaska Const. art. I, § 1), and equitable tolling of the application deadline. The superior court considered only the due process argument, ruling that the others either had not been included in the points on appeal or had been abandoned by failure to brief the issues adequately.[6] The court upheld the CFEC on the due process point, finding that the interest in the grant of a permit is a mere expectancy, and not entitled to any due process protection; and further, that, even if there were a property interest, the lateness of the application had "considerable effect on any due process she may be deserving." This appeal followed.

## II. DUE PROCESS[7]

### A. Existence of Property Interest

■ It is a basic tenet of due process that its prerequisites are state action and the deprivation of an individual interest of sufficient importance to warrant constitutional protection. *Nichols v. Eckert*, 504 P.2d 1359, 1362 (Alaska 1973). Here, the parties disagree over whether appellant's claim to a permit constitutes a property interest sufficient to invoke due process safeguards, or

---

5. Miner subsequently died on March 29, 1980, from a self-inflicted gunshot wound to the head, and thus it is her estate which is litigating the licensing issue here. For simplicity, we will refer to appellant as Miner.

6. At least as to the equal protection argument, the superior court was mistaken in not reaching the merits. This issue was clearly included in the points on appeal and a significant portion of Miner's brief dealt with the argument.

7. We note that AS 16.43.260(c) provides that an applicant "may request and obtain an administrative adjudication" if unable to establish her qualifications by submitting verified evidence with the application. The parties have not addressed the issue of whether this statute entitles Miner's estate to a hearing independent of due process.

whether it is a "mere expectancy" not entitled to due process protection.

The superior court ruled that it was the latter.[8] It relied primarily on three Alaska cases, distinguishing two cases (*Herscher v. State Department of Commerce*, 568 P.2d 996 (Alaska 1977), and *Frontier Saloon, Inc. v. Alcoholic Beverage Control Board*, 524 P.2d 657 (Alaska 1974)) which found such a property interest on the ground that they dealt with the revocation of a license, whereas the instant case deals with the grant of a license. The closest case was, in the superior court's view, *State v. Universal Education Society, Inc.*, 583 P.2d 806 (Alaska 1978), in which a mining company which had held a prospecting permit had appealed a denial of a mining lease by the Division of Lands. The superior court found a violation of due process, and the supreme court reversed, noting that "deprive" was the key word; that in order to deprive an individual of something, that individual must first possess it; that the company there, having merely applied for a lease, had no property right in the lease; and that *Herscher* was distinguishable because it had involved a revocation of a license already granted.

*Universal Education Society*, 583 P.2d at 809–10.

Miner puts forward three grounds on which she bases her claim to a property interest: first, that as a former gear license holder she was given a special status in the fishery, recognized in *Commercial Fisheries Entry Commission v. Apokedak*, 606 P.2d 1255 (Alaska 1980); second, that she possessed a statutory entitlement under the Limited Entry Act and its regulations, in that these set out definite, nondiscretionary rules which determine who shall receive permits; and third, even if she were a novice applicant, she has a protectable interest in securing the license necessary to pursue her chosen occupation.

On the first point, she argues that *Apokedak's* analysis of the Limited Entry Act makes it clear that this case deals with a revocation, and not an original application. The following passages are apposite:

Since such persons [former gear license holders] would have had a unique status in the fishing industry, they alone, if prohibited from applying for a limited entry permit, would be deprived of the status

---

8. Although the superior courts in the state have not been consistent on this point, most have found some sort of due process entitlement in the CFEC application process. The CFEC relies on two superior court cases in the course of its argument: *Wassillie v. Adasiak*, No. 3AN–75–506 Civ. (Alaska Super., July 23, 1980), *appeal docketed*, Supreme Ct. File No. 5652 (filed in the superior court September 17, 1980), and *Lewis v. CFEC*, No. 1JU–78–1034 Civ. (Alaska Super., February 14, 1980).

Although the CFEC characterizes the *Wassillie* case as a challenge to the application deadline on due process grounds, Miner points out that *Wassillie* was based on equal protection, not due process, and that its holding on this point was that there was no fundamental right to fish involved which would invoke strict scrutiny; it did not hold that no due process right existed.

In *Lewis*, although the superior court characterized the interest involved in the application process as an expectancy rather than an entitlement, it still imposed a minimal due process requirement based on the CFEC's voluntary undertaking to inform the public of the act and its requirements. Thus, neither case is particularly strong authority for the CFEC.

Further, another superior court decision, *Melton v. CFEC*, 3AN–78–7083 at 6–7 (Alaska Super., May 23, 1979), also found that an appli-

cant for a limited entry permit was entitled to some due process protection.

The CFEC has submitted as supplemental authority in support of its position nine additional decisions of the same judge that decided the case at bar. Those decisions are all consistent in holding that no property interest that would give rise to due process exists when a commercial fisherman applies for a limited entry permit. The cases all rely on substantially the same reasoning and authorities. *See Bellamy v. State*, 3HO–79–198 Civ. (December 16, 1980); *DeVaney v. State*, 3HO–79–198 Civ. (December 5, 1980); *Forquor v. State*, 3HO–79–181 Civ. (December 5, 1980); *Polushkin v. State*, 3HO–78–75 Civ. (November 20, 1980); *Gostevskyh v. State*, 3HO–78–29 Civ. (November 20, 1980); *Beaver v. State*, 3HO–79–148 Civ. (November 14, 1980); *Wickersham v. State*, 3HO–79–45 Civ. (November 14, 1980); *Wickersham v. State*, 3HO–78–315 Civ. (November 14, 1980); *Clendenen v. State*, 3HO–78–212 Civ. (November 14, 1980). *Polushkin*, 3HO–78–75 Civ.; *Gostevskyh*, 3HO–78–29 Civ.; *Beaver*, 3HO–79–148 Civ.; *Wickersham*, 3HO–79–45 Civ.; and *Wickersham*, 3HO–78–315 Civ. were all reversed on other grounds in *CFEC v. Polushkin*, Op. No. 2300 (Alaska, February 27, 1981).

which they previously enjoyed, namely, that of a licensed gear operator.

*Id.* at 1263.

[I]t is only the former gear license holders who would lose a privilege which they had previously enjoyed—that of operating or assisting in the operation of fishing gear as a gear license holder. . . .

. . . . [I]t could be concluded that the deprivation of the right to a license previously utilized poses a distinct hardship of a different and usually more substantial nature from that encountered by those not previously licensed. . . .

In fact, what has been done by the Limited Entry Act is but a modification of granting "grandfather rights," by which those who were previously engaged in a particular activity are authorized to continue in the enterprise, although the entry of others is restricted.

*Id.* at 1266–67. Although this language is all dictum as far as due process is concerned, we think it is an accurate characterization of the statute, and that the statutory scheme as applied to prior holders is more accurately characterized as a revocation than as an application. The CFEC makes no specific response to the *Apokedak* argument.

Closely related to this is Miner's second point, that the statute and the regulations lay out clear, specific, objective, nondiscretionary rules by which one's entitlement to a permit is determined, and thus her right cannot be abridged without due process. In support, she cites *Pence v. Kleppe*, 529 F.2d 135, 140–42 (9th Cir. 1976) (persons fulfilling statutory requirements for receiving Native allotment entitled to due process

protection in application process); *Koniag, Inc. v. Kleppe*, 405 F.Supp. 1360, 1370 (D.D.C.1975), *rev'd on other grounds sub nom. Koniag, Inc. v. Andrus*, 580 F.2d 601 (D.C. Cir.), *cert. denied*, 439 U.S. 1052, 99 S.Ct. 733, 58 L.Ed.2d 712 (1978) (villages' original applications for land under clear, specific and objective criteria of ANCSA entitled to due process protection); *Baker-Chaput v. Cammett*, 406 F.Supp. 1134, 1138 (D.N.H. 1976) (plaintiff making prima facie showing of legitimate, objectively justifiable claim to benefits of governmental program, rooted in legal obligation, has property interest and due process rights on original application).[9]

Miner's third argument is that all persons have a protected interest in practicing their chosen occupation, and the state cannot deny a person a license to practice her trade without affording due process, even where that person is making an original application. She cited an impressive array of case law backing this contention. Most on point is *Hilbers v. Municipality of Anchorage*, 611 P.2d 31 (Alaska 1980), in which this court found that due process did attach to an application for a "physical culture studio license." Two United States Supreme Court cases found a denial of due process in denials of original applications for admission to the bar. *Willner v. Committee on Character & Fitness*, 373 U.S. 96, 83 S.Ct. 1175, 10 L.Ed.2d 224 (1963); *Schware v. Board of Bar Examiners of New Mexico*, 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957). Additional case law from lower federal courts and other states also supports this proposition.[10]

9. We note that the point issuance level in relevant fisheries might have increased if more people had made timely application, disfranchising those who would have received permits at the present issuance level. Under the CFEC system, those with 20 points or more are automatically awarded permits; then remaining permits are awarded to those with less than 20 points in descending order until the permits are gone. Thus, had several late applicants with point totals of 19 been allowed to apply, those with point totals of 17 might no longer be eligible. Thus, Miner's entitlement may not be as clear and definite as it might seem at first.

10. We reject the CFEC's creative argument that a ruling against it on this point will render unconstitutional AS 16.43.150(e), which provides, "An entry permit constitutes a use privilege which may be modified or revoked by the legislature without compensation." Therefore, the CFEC argues, in order to find that a permit is a constitutionally protected property interest, the court must first find the statute unconstitutional and severable. Since the statute is presumed constitutional and Miner does not argue to the contrary, the statute must be deemed constitutional; and if the permit can be revoked without due process considerations

The CFEC really does not respond to this point. It notes that CFEC procedures do in fact call for a hearing before a denial in some circumstances; that it is not disputing the fact that due process considerations may be invoked by denials; and that it is only contending that a hearing is not inevitably required before denial of an application. As discussed below, this response goes more to the question of what process is due than to whether due process attaches in the first place.

We think that Miner has made a sufficient showing on all three grounds that she has a property interest in the application process. We agree with her argument distinguishing *State v. Universal Education Society, Inc.*, 583 P.2d 806 (Alaska 1978), relied upon by the superior court. It is distinguishable, Miner asserts, because in *Universal* the applicant had never previously exercised a right to mine the land, whereas Miner had exercised her right to fish; because the *Universal* statute left the conversion to be determined by the discretion of the commissioner, and did not purport to entitle anyone to a conversion; because no objective, nondiscretionary rules existed to determine exactly who was entitled to conversions; and because there was no indication that denial of the conversion would completely prevent the applicant from practicing its business, which is the case with Miner. The CFEC does not respond to these points.

▮▮▮ Although not every application for a state benefit represents a property inter-

est entitled to due process protection, we conclude that an applicant's interest under the statutory and regulatory scheme here does,[11] because of the statute's linking entitlement to past license-holding, because the standards by which applications are judged are specific and non-discretionary, and because the statute regulates individuals' pursuits of their livelihoods.

### B. What Process is Due

#### 1. Notice

Miner attacks the sufficiency of the process actually accorded her in two respects: the notice, and the hearing.

Her criticism of the notice is two-fold: first, it was generally inadequate because it omitted certain important information, and second, Miner's special status as a mental incompetent rendered the notice insufficient as to her.

The parties agree on the standard: notice must be reasonably calculated under all the circumstances to apprise the individual of the pendency of the deprivation and to afford an opportunity to present objections. *Aguchak v. Montgomery Ward Co.*, 520 P.2d 1352, 1356 (Alaska 1974).

As to the notice generally, Miner contends that it did not convey the exclusive nature of the new limited entry system over the familiar gear license system; it did not inform the recipient that failure to apply would forever preclude one from operating

---

then an applicant is *a fortiori* not entitled to due process protection.

We think that argument is fallacious under *Herscher v. State Dep't of Commerce*, 568 P.2d 996 (Alaska 1977), which, oddly enough, the CFEC tries to cite in support:

> We recognize that there is a difference between the state's plenary control over the natural resources and the taking away of a formally granted state license. The state's power over natural resources is such that it could entirely eliminate the role of hunting guides, and no problem of due process would arise.
>
> However, when the state decides to permit the harvesting of its fish and game, and in doing so permits the issuance of hunting

guide licenses, then *problems of due process do arise when the individual, rather than the group as a whole, is affected.* At that point the consideration is whether the state's procedures in taking the property right in the individual's guide license comported with due process requirements.

*Id.* at 1003 (footnotes omitted) (emphasis added).

11. *Cf. Greenholtz v. Inmates*, 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979) (no inherent protectable interest in the parole release process, but the language of individual parole statutes might create such an interest, and the Nebraska parole statutes do).

gear; and it did not inform the recipient that the permit would become property to be handed down within the family. In light of the prior system of year-to-year purchase of gear licenses with which Miner and other licensees were familiar, Miner argues, the notice was insufficient. In support, Miner relies on *Aguchak*, in which the court invalidated a statutorily-prescribed small claims summons and complaint form as not properly tailored to the capacities and circumstances of indigent residents of bush Alaska.

The CFEC responds that its yellow card was adequate. It cites *Garono v. State Board of Landscape Architect Examiners*, 35 Ohio St.2d 44, 298 N.E.2d 565 (1973), in which a licensing law included a grandfather provision for which an applicant had to apply before a certain date. Responding to the applicant's claim that he was not notified of the cut-off date, the court said:

> We are convinced that such plan was constitutionally adequate, not because it necessarily reached everyone, but because under the circumstances it was reasonably calculated to reach those who could not easily be informed by other means at hand.

*Id.* at 567. Miner attempts to distinguish *Garono* on the ground that the only right at stake was the applicant's ability to call himself a landscape architect, not his right to practice his trade.

Additionally, the CFEC emphasizes that the "yellow card" should be considered in conjunction with the other methods it used (broadcast media, et cetera), and with the widespread coverage which the limited entry program got from the news media.

The CFEC also relied on the findings of fact and conclusions of law in the *Wassillie*

and *Lewis* cases, in which two superior court judges found the notice adequate under the *Aguchak* standard.

As to the second contention, that the notice was inadequate considering Miner's mental state, appellant cites *Covey v. Town of Somers*, 351 U.S. 141, 76 S.Ct. 724, 100 L.Ed. 1021 (1956), in which the Court held that a statutorily-authorized foreclosure procedure, constitutionally adequate to inform the average person of her rights, was invalid where applied to a known incompetent unable to understand the proceedings. Appellant notes that this court cited *Covey* by analogy in *Aguchak*, holding a notice provision inadequate as applied to rural residents.

The CFEC argues that the notice urged by Miner would require the agency to individualize the notice, based on cross-referencing its yellow card list with a list of API patients or anyone who had seen a psychiatrist.[12] It also emphasizes that *Covey* dealt with a known incompetent, whereas the CFEC was unaware of Miner's mental state.

The court below did not make any explicit findings about the adequacy of the notice, since it found no property interest. It did, however, cite with approval the *Lewis* decision, which found the notice adequate.

■ We think that the notice was adequate. It undisputedly reached Miner, and we accept the CFEC's argument that, in conjunction with the CFEC's other efforts and the news coverage, the notice was sufficiently informative. We also think that whatever prejudice might have otherwise affected inarticulate applicants was eliminated by the CFEC's assistance practices, as illustrated by Mr. Miner's application here.

12. Appellant asserts that the CFEC exaggerates this burden in that the state need not have taken any more elaborate procedures in providing notice, but only compensatory-type procedures (*i. e.*, allowing late applications) when it is shown that the original notice did not suffice for a particular individual. However, we see

little indication that Miner's failure to apply in a timely manner was caused by any inadequacy of the notice; indeed, the premise is that she was mentally incompetent at the time, such that even a faultless notice would not have convinced her to apply.

## 2. Hearing

### A. Validity of "fact-policy" distinction in determining entitlement to hearing.

It is undisputed that the CFEC did not afford Miner a hearing at all.[13] Although this is normally one of the basic components of due process, it is subject, at least in the area of administrative law, to the exception that one need not hold a hearing if there is nothing to hold a hearing about; or, more precisely, "there is no requirement, constitutional or otherwise, that there be a hearing in the absence of substantial and material issues crucial to [the] determination." *NLRB v. Bata Shoe Co.*, 377 F.2d 821, 826 (4th Cir. 1967); *see also Anti-Defamation League v. FCC*, 403 F.2d 169, 171 (D.C.Cir.1968), *cert. denied*, 394 U.S. 930, 89 S.Ct. 1190, 22 L.Ed.2d 459 (1969); *Sun Oil Co. v. FPC*, 256 F.2d 233 (5th Cir.), *cert. denied*, 358 U.S. 872, 79 S.Ct. 111, 3 L.Ed.2d 103 (1958). On point is our own case of *Silides v. Thomas*, 559 P.2d 80 (Alaska 1977), in which we held that a candidate who failed to comply with filing deadlines was not entitled to a hearing on the matter: "[W]e find this argument unpersuasive since the pertinent statutes do not require a hearing and the record shows that none of the relevant facts are in dispute. Under such circumstances the Lieutenant Governor was not required to conduct an administrative hearing." *Id.* at 89.

Thus, if an application is rejected because it is outside valid time limits and this lateness is apparent on the face of the application and is not contested by the applicant, then there would be no substantial and material issue which could be resolved at a hearing, and thus no need to hold the hearing at all.

In our view, the foregoing authorities are determinative of this appeal. Here the question comes down to whether the CFEC was required to grant an exception to the filing deadline for applicants who can demonstrate that they failed to timely file because of insanity. In our view, neither due process nor equal protection, under the federal or Alaska constitutions, requires such an exception. In short, the CFEC was under no constitutional or statutory mandate to grant an exception to the filing deadline requirement to one in Miner's position. Thus, it follows that there were no substantial and material issues which required a hearing in regard to Miner's application.[14]

The judgment of the superior court upholding a denial without hearing of an application for a Limited Fishery Permit by the CFEC is AFFIRMED.[15]

**D. L. J., Appellant,**

v.

**W. D. R., Appellee.**

**No. 5411.**

Supreme Court of Alaska.

Nov. 6, 1981.

---

13. There was an aborted hearing which Miner did not attend; her husband and attorney were present, the hearing officer found the evidence of the pre-1973 gear licenses, and a continuance was granted to allow appellant to meet this new issue. It is not contended that this early partial hearing would suffice.

14. In reaching this conclusion, we reject Miner's arguments based on her contention that the invalidity of the "misadvise or lost in the mail" policy establishes her equal protection and due process claims to a hearing. Assuming arguendo that the "misadvise or lost in the mail" policy for accepting late applications was improperly promulgated, we still conclude that such a holding does not require Miner be given the opportunity to demonstrate to the CFEC that her case for accepting her late application is equally as compelling as those situations in which the CFEC has indicated it will accept late applications. As we indicated above, the CFEC is not required to grant exceptions to the applicable filing deadlines for persons with severe mental problems.

15. Our resolution makes it unnecessary to reach Miner's equitable tolling argument.