**Howard WICKERSHAM, James Wickersham, Leroy Clendenen, Roy Beaver, Grigory Gostevskyh, and Artemy Polushkin, Appellants,**

v.

**STATE of Alaska, COMMERCIAL FISHERIES ENTRY COMMISSION, Appellee.**

No. 5780.

Supreme Court of Alaska.

March 30, 1984.

C. Michael Hough, Homer, for appellants.

John B. Gaguine, Asst. Atty. Gen., Wilson L. Condon, Atty. Gen., Juneau, for appellee.

Before BURKE, C.J., and RABINOWITZ, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

BURKE, Chief Justice.

## I. INTRODUCTION

This case is a consolidation of six appeals arising under the Alaska Limited Entry Act, AS 16.43.010–16.43.990.[1] All six ap-

pellants filed untimely applications to the Commercial Fisheries Entry Commission [hereinafter "CFEC" or "Commission"] for entry permits into either the Prince William Sound or Cook Inlet drift gill net fisheries. One of the appellants, Leroy Clendenen, was an *Isakson* applicant, meaning that he held a gear license for the first time in 1973 or 1974 and, therefore, had to file an application by September 30, 1977 with a 30 day extension available for good cause. 20 AAC 05.510(f). *See Isakson v. Rickey,* 550 P.2d 359 (Alaska 1976). The other appellants were all eligible to apply during the original application period[2] which ended April 18, 1975 with a 30 day extension available for good cause.[3] Since all of these applications were received after the applicable deadline, the Commission mailed each of the appellants a form letter denying evaluation of their respective applications. Each of the appellants requested a hearing to explain the reason for their untimeliness, but the Commission also denied these requests. The Commission informed each applicant that it would only accept an untimely application if it was late because of reliance upon misinformation given by the Commission or one of its agents, or the application was timely submitted but lost in the mail, the "misadvice or lost in the mail" policy. The Commission found that none of the reasons advanced by any of the appellants came within either of these two exceptions and, therefore, refused to grant administrative hearings.[4]

---

1. Our decision in this case was deferred pending our determination of the constitutional issues raised in *State v. Ostrosky,* 667 P.2d 1184 (Alaska 1983).

2. There is some ambiguity in the record as to whether Artemy Polushkin was an *Isakson* applicant or an original applicant. Neither the CFEC nor the superior court directly resolved this issue. An examination of the record, however, reveals that Polushkin alleges to have fished the Prince William Sound drift gill net fishery in 1972 and was in possession of a gear license during that year. In his brief before this court he characterizes himself as an original applicant. Although his characterization as an original applicant or an *Isakson* applicant does not affect our holding in this case, we will refer to him as an original applicant.

3. All of the applications in this case were received after the expiration of the "good cause" period, so this exception is not relevant to our decision.

4. The reasons advanced for untimeliness were as follows: (1) Howard Wickersham—medical disability and failure to receive application materials (2) James Wickersham—failure to receive application materials (3) Leroy Clendenen—lack of notice of *Isakson* application period until deadline had passed (4) Roy Beaver—lack of notice of right to apply and of application deadline (5) Grigory Gostevskyh—failure to receive notification of the application process, inability to speak English, and Commission failure to interpret a 1975 letter as a request for an application (6) Artemy Polushkin—no reason offered.

Each of the applicants appealed the CFEC's denial to the superior court, but that court affirmed the Commission's decision as to all six appellants. This appeal followed.

The appellants present three primary reasons why the Commission should be required to consider their applications. First, appellants contend that the Commission's practice of internally circulating memoranda violated both the Administrative Procedure Act (APA), AS 44.62.010—44.62.650, and appellants' rights to due process. Second, they contend that the Commission's use of an application deadline violated their rights to equal protection. Third, appellants contend that the notice they received of the permit application process was constitutionally inadequate under the due process clauses of the federal and state constitutions. U.S. Const., amend. XIV § 1, Alaska Const. art. I, § 7.

For the reasons discussed below, we affirm the summary denial of the applications of James Wickersham, Howard Wickersham, Clendenen and Polushkin. As to appellants Beaver and Gostevskyh, we reverse and remand. We find that the Commission's efforts at notification of these two appellants were insufficient under the due process clause of the Alaska Constitution.[5]

## II. THE ADMINISTRATIVE PROCEDURE ACT

Appellants contend that the Commission violated the Administrative Procedure Act, AS 44.62.010–44.62.320 and 44.62.640,[6] by adopting what were in effect regulations without complying with notice and publication requirements. They also contend that Commission reliance on these regulations, characterized as memoranda or policy within the Commission, violated appellants' rights to due process.

Appellants submitted over twenty Commission documents acquired under a Freedom of Information Act request of July 25, 1979. The documents are primarily memoranda circulated within the Commission on a variety of issues. For example, they include guidelines for deciding what unavoidable circumstances will warrant "special circumstances" consideration by a hearing officer, treatment of investment points for spouses, apportionment of vessel points between married couples fishing as a de facto partnership, and criteria for awarding military service credit. These documents are primarily communications between Commissioners and hearing officers. Eight of the documents deal specifically with the treatment of late applications. These include a letter from one of the hearing officers to the three Commissioners and the other hearing officer in response to a request from one of the Commissioners for input regarding late applications, a letter from the Attorney General's Office to the Legislative Affairs Agency detailing the CFEC position on late applications, and a Commission adjudication decision denying consideration of an application due to its untimeliness. From these documents, it is apparent that the Commission's policy was to accept late applications only in two situations—when the application was timely postmarked but lost in the mail, or the failure to apply was due to reliance on Commission misadvice.

■ At the outset, the Commission maintains that appellants lack standing to contest these Commission procedures. In challenges to administrative practices, "this court has 'liberally construed the judicial limitation of standing and has favored increased accessibility to the courts.'" *Sisters of Providence in Washington, Inc. v. Department of Health and Social Services*, 648 P.2d 970, 974 (Alaska 1982) *quoting State v. Lewis*, 559 P.2d 630, 634 (Alaska 1977); *Coghill v. Boucher*, 511 P.2d 1297, 1303 (Alaska 1973). We nonetheless seek a demonstration of a sufficient personal stake in the outcome of the controversy to

---

**5.** Alaska Const. art. I, § 7.

**6.** These provisions of the Administrative Procedure Act are made applicable to the Commission under AS 16.43.120(b).

assure that the proceedings will be adversarial in nature. *Sisters,* 648 P.2d at 974.

■ In so far as appellants' challenge extends beyond the late application policy, we readily agree with the Commission's assertion that appellants lack standing. Appellants have as yet no personal stake in the manner in which points are allocated to individuals whose applications are under consideration by the Commission. Appellants' applications were denied any consideration by the Commission. Thus, they have not established a competitive effect on their economic interest sufficient to ensure adversariness and confer standing on these issues. *K & L Distributors, Inc. v. Murkowski,* 486 P.2d 351, 353–54 (Alaska 1971).

The appellants challenge to the manner in which the two exceptions to the filing deadline were adopted presents a more difficult question. This court faced a similar challenge to the "misadvice or lost in the mail" policy in *Estate of Miner v. Commercial Fisheries Entry Commission,* 635 P.2d 827 (Alaska 1981). In that case, Miner's estate contended that the CFEC was required to grant an exception to the filing deadline for applicants who could demonstrate that they failed to timely file because of insanity. We rejected Miner's contention that the alleged invalidity of the "misadvice or lost in the mail" policy established her equal protection and due process claims to a hearing:

> Assuming arguendo that the "misadvice or lost in the mail" policy for accepting late applications was improperly promulgated, we still conclude that such a holding does not require Miner to be given the opportunity to demonstrate to the CFEC that her case ... is equally as compelling as those situations in which

the CFEC has indicated it will accept late applications.... [T]he CFEC is not required to grant exceptions to the applicable filing deadlines for persons with severe mental problems.

*Estate of Miner,* 635 P.2d at 834 n. 14.

■ When a policy is invalidly promulgated under the APA, generally the appropriate remedy is to invalidate the offending policy until the procedures required by the APA are observed.[7] If the "misadvice or lost in the mail" policy was invalidated, there would no longer be any exceptions to the deadlines specified in 20 AAC 05.510. Under this validly adopted deadline regulation, the Commission would still have the authority to refuse consideration of the appellants' applications.[8] In the present case it is inappropriate to consider the validity of Commission procedures which regardless of their validity have no impact on the appellants. Since appellants have no stake in the resolution of the validity of the policy, they are without standing. Our review in this case is limited to whether there are underlying constitutional infirmities in the Commission's refusal to consider these late applications.[9]

## III. THE APPLICATION DEADLINE

The six appellants also challenge the Commission's use of an administrative deadline for the receipt of applications. Essentially, appellants argue that one of the primary tasks of the Commission was to locate and rank those persons who would suffer significant hardship if excluded from the fishery. The deadline operated to automatically exclude a number of hardship cases; thus, the deadline classification bears no rational relationship to the legislative purpose. As a result, appellants' rights to equal protection are violated.[10]

7. *See Kenai Peninsula Fisherman's Cooperative Ass'n. v. State,* 628 P.2d 897, 906 (Alaska 1981).

8. *See infra* Part III where we conclude that the use of a deadline does not violate appellants' rights to equal protection.

9. Although in their reply brief appellants make a generalized assertion that they fall within the exceptions, the Commission rejected this con-

tention for each appellant. We find these conclusions supported by substantial evidence in the record. *Keiner v. City of Anchorage,* 378 P.2d 406, 411 (Alaska 1963).

10. Appellants also contend that the Commission's "misadvice or lost in the mail" policy violates their rights to equal protection. For the reasons expressed in Part II of this opinion, this contention is without merit.

For the reasons set forth below, we reject this claim.

20 AAC 05.510(c) states:

The Commission will consider only those entry permit applications that are received on or before the closing date for application for that fishery.[11]

This regulation was adopted pursuant to AS 16.43.260(b) of the Limited Entry Act, which provides in part:

The Commission shall establish the opening and closing dates, places and form of application for entry permits for each fishery.

The deadline regulation operates to classify permit applicants into two groups—those who send in applications before the deadline and those who miss the deadline. Applications of the former group will be evaluated, while those of the latter group will not be.

█ But the mere fact that the regulation and statute impose a classification does not in and of itself violate equal protection. Rather, in cases not involving fundamental rights or suspect classifications,[12] we require as a minimum "that the legislation be based on a legitimate public purpose and that the classification 'be reasonable, not arbitrary, and ... rest upon some ground of difference having a fair and substantial relation to the object of the legislation....' *Isakson v. Rickey,* 550 P.2d at 362 (quoting *State v. Wylie,* 516 P.2d 142, 145 (Alaska 1973))." *State v. Ostrosky,* 667 P.2d 1184, 1193 (Alaska 1983).[13]

█ The more important the individual right asserted, the greater the degree of relationship between the classification and the object or purpose of the legislation must be. *Ostrosky,* 667 P.2d at 1193. Although the interest of an applicant in the entry permit is not fundamental,[14] a prior gear license holder's stake in the application process is important. *Commercial Fisheries Entry Commission v. Apokedak, (Apokedak I),* 606 P.2d 1255, 1266 (Alaska 1980). *Cf. Estate of Miner v. Commercial Fisheries Entry Commission,* 635 P.2d 827, 832 (Alaska 1981) (applicant's interest under Limited Entry Act a property interest entitled to due process protection). We will therefore require a relatively high degree of relationship between the legislation's purpose and the application deadline.

In *Apokedak I* we discerned three legitimate purposes of the Limited Entry Act:

1) enhancing the economic benefit to fishermen since too many involved in the industry prevented those relying on fishing for a livelihood from securing adequate remuneration; 2) conserving the fishery; ... [and] 3) avoiding unjust discrimination in the allocation of a limited number of entry permits.

606 P.2d at 1265.[15]

█ Moreover, in enacting the Limited Entry Act, the legislature found that fishery levels of participation "have impaired or threaten to impair the economic welfare of the state, the overall efficiency of the

---

**11.** *See supra* note 3 for a discussion of the closing dates applicable to appellants.

**12.** We have previously determined that the right to a limited entry permit is not a fundamental right, nor is the classification in question suspect. *Isakson v. Rickey,* 550 P.2d 359, 363 (Alaska 1976). Thus, there is no need to invoke the strict scrutiny analysis required in such cases under the federal constitution. *State v. Erickson,* 574 P.2d 1, 11–12 (Alaska 1978).

**13.** Since the intensified rational basis test adopted in Alaska subjects classifications to greater scrutiny than the federal rational basis test, we limit our discussion to whether the challenged regulations satisfy state equal protection. *Rose v. Commercial Fisheries Entry Comm'n,* 647 P.2d 154, 158 (Alaska 1982).

Since we determine that the Alaska test is satisfied, it follows necessarily that federal equal protection is also satisfied.

**14.** *Isakson,* 550 P.2d at 363; *Commercial Fisheries Entry Comm'n. v. Apokedak,* 606 P.2d 1255, 1262 (Alaska 1980).

**15.** *Apokedak I* also noted that the gear license requirement made administration of the program more convenient. Undoubtedly, the use of a deadline also aids the Commission in administering the limited entry program. However, such convenience is insufficient reason alone to justify the deadline. *See Apokedak I,* 606 P.2d at 1266.

harvest, and the sustained yield management of the fishery resource." AS 16.43.-010(b). When the purposes of the Act are viewed in light of this legislative finding of fact, the intent of the legislature that the limitation of entry into the fisheries be expeditiously effectuated seems clear. We find such an intent to fall well within the legitimate police power of the state.[16]

The use of an application deadline substantially furthered an expeditious enhancement of the economic benefit to fishermen and conservation of the fishery. By setting a date after which applications would no longer be accepted, the Commission insured distribution of a fixed number of permits within a reasonable time.[17] The sooner such permits were distributed, the better off economically those permit recipients were since the number of people involved in the fishery was restricted. By the same reasoning, the second purpose of the Limited Entry Act, conserving the fishery, was also benefitted by establishing a time period within which applications had to be received.

The basic issue raised by the appellants is whether the automatic exclusion of untimely hardship cases caused by the deadline conflicted with the third purpose of the Limited Entry Act, avoiding unjust discrimination. The key word is "unjust". Certainly the application deadline discriminated—as does any classification. But we are not persuaded that the use of a deadline by the Commission amounted to unjust discrimination. To the contrary, the overall allocation of permits may well have been more equitably accomplished by the enforcement of a permit application deadline, since such a deadline enabled the Commission to rank a defined pool of applicants rather than make continual ad hoc determinations of eligibility for consideration.[18]

■■■ The Commission's refusal to consider late applications allowed it to compare applicants and issue permits without risking the possibility that a late application would upset the rankings on which it had decided.[19] Moreover, the use of the deadline was essential to the effective administration of the Act. Setting a deadline defined and limited the group of applicants among whom the Commission had to choose. Until such a group was defined, the permits could not be fully distributed. In this light, we think that the Commission's decision to allocate permits to less meritorious but timely fishermen over untimely but potentially more meritorious fishermen did not unjustly discriminate in contravention of the Act's purposes. We conclude that the deadline requirement does not violate the equal protection provi-

**16.** *See* Alaska Const. art. VIII, § 15; *see also Apokedak I,* 606 P.2d at 1265.

**17.** The legislature's decision to restrict the number of permits is constitutional. *Apokedak I,* 606 P.2d at 1265.

**18.** In support of their position, appellants cite AS 16.43.270(a) which provides:

The commission shall issue entry permits, for each fishery, first to all qualified applicants in the priority classifications designated under AS 16.43.250(b) and then to qualified applicants in order of descending priority classification, until the number of entry permits issued equals the maximum number of entry permits ... except that *a person* within a priority classification ... may not be denied an entry permit.

(Emphasis added). Appellants contend this statute requires that any person who would have been classified in the significant hardship category if he had timely applied must be given a permit.

We reject this contention. The final clause of AS 16.43.270(a) must be read in conjunction with the rest of the section. *Estate of Hutchinson,* 577 P.2d 1074, 1075 (Alaska 1978). Using this principle it is clear that the "person" referred to in the last sentence must be a "qualified applicant" referred to in the remainder of the section. A person does not fall within a classification until his application is accepted by the CFEC.

**19.** *See Noden v. State, Commercial Fisheries Entry Comm'n,* 680 P.2d 493, (Alaska 1984). In *Noden,* the timing of the hearing opportunity was challenged as violative of due process. We discussed there the need for a 45 day time limit for requesting hearings following classification in order for the Commission to be able to effectively rank applicants and thus award permits. 680 P.2d at 499–500. Similar considerations apply here.

sion of either the Alaska or federal constitutions.[20]

## IV. NOTICE OF THE APPLICATION PROCESS

Appellants also contend that the form of notice they received of the permit application process was constitutionally inadequate. They contend that the gravity of the interest at stake—obtaining an entry permit—required the Commission to make greater efforts to insure notification of each of the appellants.

The Commission did make considerable efforts to alert many of the potential applicants of the permit application process and deadline. In July, 1973, direct mailings explaining the entry permit program were mailed to all gear license holders from 1969 to 1972. An additional informational letter was mailed to all gear license holders from 1970 to 1973 in September, 1973. When a deadline was later established, the Commission publicized the deadline in numerous radio and newspaper ads in many parts of the state. Moreover, individuals and organizations were hired to provide application assistance.

In the fall of 1974, the Commission sent out two mailings to all names on the fisherman's history file. The fisherman's history file was a compilation of all gear license holders for any year from 1969 to 1972 who had made actual deliveries of fish under their license number during those years. One mailing was a pamphlet containing the newly adopted Commission regulations and an explanation of the regulations. The other mailing was a yellow card which the recipient could use to request permit applications from the Commission.[21]

The Commission also compiled a log book of potential *Isakson* applicants, those fish-

ermen who first had a gear license in 1973 or 1974. All fishermen in the log book were sent *Isakson* applications by the Commission in 1976. The Commission also distributed news releases and made *Isakson* applications available at local Fish and Game offices. Finally, the Commission again contracted with individuals and organizations to provide application assistance.

The Commission contends that none of these outreach efforts were constitutionally mandated. It argues that the applicable rule of notice is that all individuals dealing with the government are charged with knowledge of its laws and regulations. Thus, according to the Commission, inclusion of the application procedure and deadline in the regulations, 20 AAC 05.500–05.510, was by itself constitutionally adequate notice.

The cases on which the Commission relies to support this principle are distinguishable. In *San Diego Building Contractors Association v. City Council of San Diego*, 13 Cal.3d 205, 118 Cal.Rptr. 146, 529 P.2d 570 (1974), *appeal dismissed*, 427 U.S. 901, 96 S.Ct. 3184, 49 L.Ed.2d 1195 (1976), San Diego had adopted a zoning ordinance by initiative without providing notice to all affected property owners. The California Supreme Court upheld the lack of notice. The court noted:

> the decisions applying the due process requirements of notice and hearing have all involved governmental decision making in an *adjudicative* setting, in which the government's action affecting an individual was determined by facts peculiar to the individual case; the present matter, by contrast, involves the adoption of a broad, generally applicable, *legislative* rule. The seminal decisions of the Unit-

**20.** We will, however, consider specific due process challenges to the failure of the Commission to consider late applications. Thus, we conclude in Part IV of this opinion that consideration of late applicants who received inadequate notice is compelled by due process.

**21.** The Commission made efforts to send application request yellow cards to all gear license

holders in families engaged in set net fishing, even though all the fish were often landed under only one gear license number. However, a person involved in cooperative arrangements with gear other than set nets, who had a gear license but did not make the deliveries under his own gear license number, would not receive either the pamphlet or the yellow card.

ed States Supreme Court clearly indicate that the due process requirements of notice and hearing are applicable only to governmental actions of an *adjudicatory* nature.

529 P.2d at 574 (emphasis in original, footnote omitted).

In *Federal Crop Insurance Corp. v. Merrill*, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947), Merrill had received crop insurance from the Federal Crop Insurance Corporation for his spring wheat. The local agents who provided the insurance assured Merrill that his crop was insurable. Unbeknownst to both the agents and Merrill, a published regulation of the Insurance Corporation specified that the particular wheat was uninsurable.

The Supreme Court held that the regulations were binding on Merrill. The Court found a "duty of all courts to observe the conditions defined by Congress for charging the public treasury. The 'terms and conditions' defined by the Corporation, under authority of Congress, for creating liability on the part of the government preclude recovery for the loss." 332 U.S. at 385, 68 S.Ct. at 3, 92 L.Ed. at 15.

Neither of these cases is controlling. In *San Diego* the city had adopted a zoning ordinance—a statutory enactment. Individuals do not have a constitutional right to personal notice of potential statutes of general applicability prior to their enactment. In *Merrill* the regulation specified the liabilities of the federal treasury. The Court had no power to exceed a treasury allocation authorized by Congress.

 In the instant case, however, this court has found that the applicant's interest in the application process is a property interest entitled to due process protection. *Estate of Miner v. Commercial Fisheries Entry Commission*, 635 P.2d 827, 832 (Alaska 1981). In *Miner*, we noted that "the statutory scheme as applied to prior [gear license] holders is more accurately characterized as a revocation than as an application." 635 P.2d at 831. A revocation of the right to fish would result if an individual failed to learn of the limited entry program in time to obtain a permit.

 When viewed as a revocation procedure, the application process approaches an adjudicative action undertaken by the Commission. The applications that were timely submitted were factually investigated by the Commission and then awarded a point total based on a Commission determination. An applicant that disagreed at this stage was entitled to an administrative hearing with judicial review. The Limited Entry Act authorized the CFEC to begin an adjudicatory process for all permit applicants. The fact that a large number of people were involved does not alter the characterization of these proceedings. When an agency makes individual factual determinations on which the impact of the law on the individual depends, it is acting in an adjudicative capacity. *Adams v. Marshall*, 212 Kan. 595, 512 P.2d 365, 369 (1973). *See also City of Homer v. State, Department of Natural Resources*, 566 P.2d 1314, 1317 (Alaska 1977).

 Due process requires "that deprivation of life, liberty or property by adjudication be preceded by notice ... appropriate to the nature of the case." *Mullane v. Central Hanover Bank and Trust Co.*, 339 U.S. 306, 313, 70 S.Ct. 652, 656, 94 L.Ed. 865, 873 (1950). "An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action." 339 U.S. at 314, 70 S.Ct. at 657, 94 L.Ed. at 873. *Aguchak v. Montgomery Ward Co., Inc.*, 520 P.2d 1352, 1356 (Alaska 1974) (adoption of *Mullane* language for analysis under Alaska Constitution).

 Appellants contend personal service of written notice to each potential applicant was required. But in determining the type of notice that is constitutionally required, the interest of the state in efficiently carrying out the purposes of the Limited Entry Act must be balanced against the individual interest sought to be

protected by the due process clause. *Mullane*, 339 U.S. at 314, 70 S.Ct. at 657, 94 L.Ed. at 873. *See also Mathews v. Eldridge*, 424 U.S. 319, 334, 96 S.Ct. 893, 902, 47 L.Ed.2d 18, 33 (1976) ("whether the administrative procedures provided here are constitutionally sufficient requires analysis of the governmental and private interests that are affected"); *Aguchak*, 520 P.2d at 1357 ("Whenever a party demonstrates a prima facie denial of due process of law, the reviewing court must balance the interest of the state in the act or procedure challenged against the right denied the individual."). We therefore proceed to an analysis of the competing interests at stake in the permit application process to determine whether the form of notice directed at each of the appellants was constitutionally sufficient.

Four of the appellants, Leroy Clendenen, Artemy Polushkin, Howard Wickersham and James Wickersham, are listed in either the fisherman's history file or the *Isakson* log book.[22] Therefore, absent clerical error, the Commission sent each of these appellants either a yellow card to submit for an application or, for *Isakson* applicant Clendenen, the application itself. Appellants contend that this form of notice was insufficient to insure contact with each of the appellants and, therefore, resulted in denial of their right to procedural due process.

Certainly these individuals all have a considerable stake in being apprised of the application deadline. They had all fished commercially and absent a permit would be precluded from fishing in the manner they had done in the past.

However, the state had an interest in administering the program in a cost-effective manner. The Commission used a wide variety of communication media in an attempt to reach eligible applicants. In addition to the yellow card and application mailing, the CFEC attempted to recontact individually those individuals on the fisherman's history file that had not requested an application some six months after the yellow card was mailed. Moreover, the Commission contracted for individualized assistance and advertised the deadline on radio, television, and in newspapers. We find that the Commission's effort to notify these four appellants was constitutionally adequate, even if the materials sent by the Commission never actually reached them.[23] The efforts at individualized notice as to these four appellants, combined with the media coverage, produced a sufficient probability of notification to comply with due process.[24]

The other two appellants, however, did not receive yellow card application request forms. Roy Beaver last had a gear license in 1969. He had not fished from 1969 to 1978. Although he had a gear license in 1969, Beaver apparently made no deliveries under that license number in that year. As a result, he was not listed in the fisherman's history file. Similarly, Grigory Gostevskyh held a gear license in 1971, but apparently made no deliveries under the license number in that year. Therefore, Gostevskyh was not listed in the fisherman's history file either.

Although both Beaver's and Gostevskyh's names and addresses were initially in the Commission's computer records when the fisherman's history file was developed,

---

**22.** The listings of Howard Wickersham and Leroy Clendenen are included in the record. Also included is a copy of a yellow card completed by Howard Wickersham and received by the Commission on November 22, 1974. As to appellants James Wickersham and Artemy Polushkin, pursuant to Alaska Rule of Evidence 201, we take judicial notice of the fact that each of these names was on Commission lists to which individualized notice was sent. Those facts are included in Commission Record # R01–03B–6729.

**23.** Given the number of potential applicants, bulk mailing was not an unreasonable method of assistance. *Cf. State v. Bowers Office Products, Inc.*, 621 P.2d 11, 13 (Alaska 1980).

**24.** Nor do we find these four appellants were denied equal protection. Indeed, appellants brief places these four appellants in the group of applicants receiving preferential treatment in comparison to those applicants allegedly denied equal protection.

their names were removed since no fish deliveries were credited to their license numbers. Each had presumably been mailed 1973 informational leaflets about limited entry since they were both gear license holders sometime between 1969 and 1972.[25] However, neither received any subsequent Commission mailings.

Gostevskyh's correspondence with the Commission gives some indication of the degree of his unawareness of the need to apply for a limited entry permit. In January, 1975, during the original application period, he sent a handwritten letter to the Commission which stated:

[Please send me] license issued subject to federal law relating to alien commercial fisherman's license n. 45403 and gear license no. 38578.

Regardless of whether such communication was received by the Commission, it is indicative of Gostevskyh's lack of knowledge of the need for a limited entry permit in addition to gear and fishing licenses. As a CFEC staffperson observed, it "does not indicate that [Gostevskyh] was applying for anything other than a commercial fishing license or a gear license."

Gostevskyh renewed his request for a "license" in 1977. Again, the request exhibits his lack of knowledge of a new permit process supplementing the license requirements. This letter, dated January 12, 1977, stated:

I obtained a license in 1971 for commercial salmon fishing. Please, send me an application for a renewal or new license.

It was not until October 21, 1977 that the Commission sent a letter to Gostevskyh's attorney explaining the limited entry program. It is apparent from these communications that Gostevskyh had little, if any, awareness of limited entry prior to 1977.

Roy Beaver submitted an affidavit along with his application which stated:

On the date this Affidavit is signed [January 19, 1979], Affiant learned that persons having gear licenses prior to January 1, 1973 and who made deliveries under such gear licenses were entitled to apply for a free limited entry permit. . . . [I]t was only following the death of his wife [June 22, 1978] that he contacted a close friend who is involved in the fishery and, after discussing his predicament with local Fish and Game officials in Tok, concluded that he was a person who should have received the opportunity to apply for a permit . . .

Similarly, in his brief before the superior court, Beaver alleged he "was never informed of his right to apply."

■■■ Thus, both of these applicants have sufficiently alleged that they lacked actual notice of their qualification to apply for a permit within a specified time period.[26] We must therefore determine whether the efforts the Commission made in attempting to notify these individuals were constitutionally sufficient.

The Commission had the addresses of both of these individuals in 1973, yet decided to remove their names from the computer mailing list they were developing. This policy was based on the view that these gear license holders would have insufficient points to qualify for a permit.[27] The

---

**25.** Two informational mailings were made in 1973. The first was to all gear license holders from 1969 to 1972, and thus would have been directed to both Beaver and Gostevskyh. The second was made to license holders from 1970 to 1973, and would have been sent to Gostevskyh but not Beaver.

**26.** We leave open for determination by the Commission whether in fact Beaver and Gostevskyh had actual notice of their personal interest in the application process. Despite the constitutional infirmities of Commission efforts at notification of these individuals, if the Commission can sufficiently refute the allegations of these

individuals and establish that they did in fact have actual notice of their specific entitlement to apply for a permit within the applicable time period, then their untimely applications need not now be accepted.

**27.** AS 16.43.260(a) defines eligible applicants as those "who have harvested fishery resources commercially while participating in the fishery as holders of gear licenses" prior to specified time limits. Neither the statute nor the CFEC's regulations require deliveries of fish to be made under one's own gear license—hence it provides the CFEC no basis for according Beaver and Gostevskyh less notice.

omission of these names reduced the number of yellow cards mailed by only a "small degree" according to a Commissioner. Yet this same Commissioner recognized that those individuals deleted were potentially eligible applicants.

In *Mullane v. Central Hanover Bank and Trust Co.*, 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950), trust beneficiaries alleged insufficient notice of a March, 1947 settlement of their trust account. The trust had been formed in January, 1946. At the time of formation, the bank had notified known beneficiaries of the creation of the common trust fund. It had also sent a copy of the Act authorizing the periodic judicial settlement of the account and stated that notice by publication would be used to inform the beneficiaries when such periodic settlements occurred. Despite this general notice in 1946, the Supreme Court found the failure to give notice by mail to known beneficiaries of the specific settlement in 1947 constitutionally defective. The Court held:

> The trustee has on its books the names and addresses of the income beneficiaries represented by appellant, and we find no tenable ground for dispensing with a serious effort to inform them personally of the accounting, at least by ordinary mail to the record addresses. *Certainly sending them a copy of the statute months and perhaps years in advance does not answer this purpose.* The trustee periodically remits their income to them, and we think that they might reasonably expect that with or apart from their remittances word might come to them personally that steps were being taken affecting their interests.

339 U.S. at 318, 70 S.Ct. at 659, 94 L.Ed. at 875–76 (citations omitted; emphasis added).

Like the trust beneficiaries in *Mullane,* Beaver and Gostevskyh received only a brochure explaining the program in general terms in 1973. They were not individually notified of the application process or deadlines despite the ease of access to their addresses. "Where the names and post-office addresses of those affected by a proceeding are at hand, the reasons disappear for resort to means less likely than the mails to apprise them of its pendency." *Mullane,* 339 U.S. at 318, 70 S.Ct. at 659, 94 L.Ed. at 875.

We find the Commission did not take steps reasonably calculated to apprise appellants Beaver and Gostevskyh of the application process. The Commission made a decision to not notify these appellants by individual letter of the application procedure and deadline in 1974 despite the accessibility of their addresses. Yet an examination of the applications which were eventually submitted from these appellants shows that each alleged sufficient points to qualify immediately for a permit.[28] We find the notice given to Beaver and Gostevskyh was constitutionally inadequate under the Alaska due process clause, Alaska Const. art. 1, § 7.[29] We therefore remand this case to the superior court with direction to order the Commission to evaluate the applications of appellants Beaver and Gostevskyh.

AFFIRMED in part; REVERSED and REMANDED in part.

---

**28.** Permits were distributed according to a point system. *See* 20 AAC 05.600–686. The higher the total number of points, the greater the degree of hardship the applicant would suffer by exclusion from the fishery. If an applicant had 20 or more points verified by the Commission, a permit was automatically granted. Beaver's application alleged 20 points; Gostevskyh's alleged 31 points.

**29.** We rest our holding on this issue on the Alaska due process clause, Alaska Const. art. I, § 7. Since we determine that notice was inadequate under our state constitutional provision, we need not determine whether federal due process was also violated.